IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JAMIE SPRADLIN                                                                                    PLAINTIFF

V.                           Civil No. 5:20-cv-05192-PKH-MEF

KILOLO KIJAKAZI[1], Acting Commissioner,
Social Security Administration                                                                    DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Jamie Spradlin, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (the "Commissioner") denying her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 1382. In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. 42 U.S.C. § 405(g).

### I.      Procedural Background

Plaintiff filed her application for SSI on November 6, 2017,[2] alleging disability due to menstrual cramps, bipolar disorder, anxiety, and depression. (ECF No. 12-7, pp. 6, 12-13, 38-39). An administrative hearing was held on September 19, 2019. (ECF No. 12-3, pp. 21-49). Plaintiff was present and represented by counsel.

---

[1] Kilolo Kijakazi became Acting Commissioner of the Social Security Administration on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Plaintiff filed three prior SSI applications. Her 2011 application was denied at the hearing level in August 2012, while her 2013 and 2014 applications were denied at the initial level in June and December 2014, respectively. (ECF No. 12-4, pp. 5-12).

Born in 1977, Plaintiff possessed an eleventh-grade education. (ECF No. 12-2, p. 17). She has no past relevant work ("PRW") or transferable skills. *Id.* at 18.

On December 11, 2019, the Administrative Law Judge ("ALJ") identified Plaintiff's schizoaffective disorder-bipolar type and panic disorder as severe impairments. (ECF No. 12-2, p. 14). He concluded she did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ then found her capable of performing a full range of work at all exertional levels with the following mental restrictions: the interpersonal contact is incidental to the work performed; the required tasks are no more complex than those learned and performed by rote with few variables and little judgement; and the supervision needed is simple, direct, and concrete. *Id.* at 15. With the assistance of a vocational expert ("VE"), he then found there were jobs that exist in significant numbers in the national economy that Plaintiff can perform, specifically a dishwasher, DOT 318.687-010, and a hand packager, DOT 920.587-018. *Id.* at 11.

The Appeals Council denied review on August 26, 2020. (ECF No. 12-2, pp. 2-6). Plaintiff subsequently filed this action. (ECF No. 1). Both parties have filed appeal briefs (ECF Nos. 15, 16), and the matter is ready for Report and Recommendation.

## II.     Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the

record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id.*

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. 20 C.F.R. § 416.920(a)(4). The fact finder only considers Plaintiff's age, education, and work experience in the light of her residual functional capacity if the final stage of the analysis is reached. 20 C.F.R. § 416.920(a)(4)(v).

### III. Discussion

Plaintiff raises four issues on appeal: (1) whether the ALJ fully developed the record; (2) whether the ALJ erred at Step Two of the sequential analysis; (3) whether the ALJ properly evaluated her subjective complaints; and (4) whether the ALJ's RFC determination is supported by substantial evidence.

Before addressing the evidence, it is important to note that the relevant period in this case is limited. SSI benefits may not be granted prior to a claimant's application filing date, because benefits through an SSI application are allowed only after all regulatory criteria are established. *See* 20 C.F.R. § 416.335; *Jernigan v. Sullivan*, 948 F.2d 1070, 1072 n. 3 (8th Cir. 1991). Further, more than two years have elapsed from the date of Plaintiff's most recent prior application, December 2014, and the filing of her current application on November 6, 2017, rendering the earlier decision ineligible for reopening. *See* 20 C.F.R. § 416.1488(b) (2019) (initial determination may be reopened within two years if there is a finding of good cause). Therefore, Plaintiff must prove that her disability commenced on or after November 6, 2017, her application date, and continued through December 11, 2019, the date of the ALJ's decision.

The ALJ does owe a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004); *see also Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014) (citing *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994)). In so doing, the ALJ should recontact a treating or consulting physician if a critical issue is undeveloped and order medical examinations and tests when the medical records presented to him are insufficient to determine whether the claimant is disabled. *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted).

Because the Plaintiff had filed several prior SSI applications, the transcript presently before the Court contains numerous records documenting her mental health treatment prior to, as well as during the relevant period. These early records are only relevant to the extent that they shed light on the Plaintiff's mental state during the relevant period. *See Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) (Records and medical opinions from outside the relevant period can only be used in "helping to elucidate a medical condition during the time for which benefits might be rewarded."). Therefore, while the ALJ could not base his decision solely on these records, he could consider them in establishing the severity of Plaintiff's mental impairments at or near her application date.

Plaintiff's history of treatment for depression dated back to at least 2010, for which Advanced Practical Nurse Sara Butler prescribed Prozac. (ECF No. 12-8, p. 7). At that time, the Plaintiff was pregnant with her fourth child. Although Prozac was initially beneficial, she was switched to Zoloft in early 2011. *Id*. at 22. Following the birth of her child in April 2011, Plaintiff was diagnosed with postpartum depression. *Id*. at 28.

In July 2011, she was treated in the Emergency Room after experiencing a panic attack. (ECF No. 12-8, p. 52). She explained that her post-partum mood swings and depression were worse than ever before. Noting a depressed mood with a headache, the doctor diagnosed a panic attack and depression.

The following month, Dr. Terry Efird conducted a mental evaluation. (ECF No. 12-8, pp. 63-67). Her mood was generally dysphoric, her affect somewhat restricted, and her thoughts primarily logical and goal directed. However, she endorsed dreaming about demons and "sensing evil spirits." Dr. Efird diagnosed panic disorder with agoraphobia and depressive disorder. He

found no remarkable problems with her attention, concentration, persistence, or pace, and concluded she had the mental capacity to persist if she desired to do so.

In October 2011, Plaintiff began formal mental health treatment with Gary Greenwood, a Licensed Professional Counselor, and Alice Slavens, an Advanced Practical Nurse, at Western Arkansas Counseling and Guidance Center ("WACGC"). (ECF No. 12-8, pp. 88-98). They diagnosed her with paranoid schizophrenia and bipolar I disorder with psychotic features. For this, they prescribed psychotherapy, an increased dosage of Zoloft, and a trial of Latuda.

On May 21, 2012, Mr. Greenwood prepared an assessment of the Plaintiff. (ECF No. 12-8, pp. 111-112). He indicated that she sometimes experienced psychotic symptoms that caused problems in her personal relationships, social interactions, and work settings. Further, her manic moods resulted in distracted, tangential thoughts, behaviors, and actions. Plaintiff also tended to isolate, withdraw, and fail to fulfill her obligations. Regarding her attention and concentration, Mr. Greenwood noted that, at times, she appeared to show some rational thinking and cognitive control, however, these occasions were both minimal and fleeting. During his interactions with her, she had difficulty answering questions without getting distracted. And despite being on several medications, her overall improvement was only minimal. She remained very anxious in social situations and experienced paranoia. Unfortunately, the Plaintiff was never consistent in her responses to her environment, her friends, her past work situations, or in her therapy attendance.

On October 9, 2014, Plaintiff was evaluated by Dr. Gene Chambers. (ECF No. 12-8, pp. 115-120). After reviewing her medical records, Dr. Chambers noted they were consistent with a history of psychosis, depression, and anxiety. While she reported a history of depression and visual hallucinations dating back to her childhood, she explained that her symptoms intensified

during her 20s. At that time, she also began to experience mood swings. When her mood was high, she was very energetic, cleaned a lot, did not sleep, and spent money irresponsibly. When her mood was low, she was despondent, paranoid, and verbally abusive. According to Plaintiff's estimates, she experienced one manic episode per month and both her manic and depressed moods typically lasted two to three days. Plaintiff also reported experiencing panic attacks, averaging once per week. Noting her to be both depressed and anxious, Dr. Chambers diagnosed schizoaffective disorder - bipolar type, panic disorder, and agoraphobia. He assessed moderate limitations in her ability to communicate and interact socially; communicate in an intelligent and effective manner; and cope with the typical mental/cognitive demands of basic work-like tasks. Further, he noted moderately severe limitations in her ability to attend and sustain concentration, to sustain and complete work-like tasks, and to complete work-like tasks within an acceptable time frame.

Beginning in December 2016, psychiatrist, Dr. Donald Chambers, took over Plaintiff's care. (ECF No. 12-9, p. 3). Although she did not feel that her medications were working, Dr. Chambers increased her Klonopin and Abilify, prescribed Neurontin, and discontinued the Wellbutrin. In January and March 2017, Plaintiff reported doing very well with no depression. *Id.* at 4-6. She remained stable at her June follow-up and Dr. Chambers indicated that although he was still considering the addition of a new medication, he would make no changes due to her progress. *Id.* at 7. It appears, however, that he later prescribed Trintellix, as she reported some gastrointestinal side effects during her October follow-up. *Id.* at 9. Noting her to be less depressed, Dr. Chambers agreed to prescribe Cymbalta, but he had to switch her to Paxil because she could not obtain the Cymbalta. *Id.* at 10. On October 27, 2017, he noted it to be working well. *Id.*

On February 13, 2018, Dr. Patricia Walz diagnosed Plaintiff with schizoaffective disorder-bipolar type, and panic disorder. (ECF No. 12-9, pp. 57-60). Plaintiff again endorsed seeing and hearing demons and reported she dropped out of school after the 11th grade because she "just couldn't do it anymore." Her mood was anxious, her affect was flat, and when questioned, she tended to give extraneous details and repeat herself, requiring Dr. Walz to interrupt her to go on to the next question. Moreover, her speech was pressured, her thoughts circumstantial, and her estimated IQ low average. Dr. Walz opined that Plaintiff's social skills were impaired by her anxiety, her psychotic symptoms interfered with her ability to learn and retain skills, her attention and concentration were impaired, she was distracted by internal stimuli, and her speed of information processing was slow.

Two days later, Dr. Abesie Kelly, reviewed the record, including Dr. Walz's assessment and records from her treating psychiatrist, Dr. Donald Chambers, and found Plaintiff to have severe bipolar and generalized anxiety disorder that resulted in moderate limitations in her ability to understand, remember, and apply information, and to concentrate, persist, and keep on pace. (ECF No. 12-4, pp. 25-28). In August, Dr. Steve Brown affirmed Dr. Kelly's assessment, noting Plaintiff could perform work where the interpersonal contact was incidental to the work performed, e.g., assembly work; the complexity of the tasks was learned and performed by rote with few variables and little judgment; and the supervision required was simple, direct, and concrete.

Records indicate that Plaintiff began receiving her medication refills from her primary care physician ("PCP"), Dr. Michael Guyer, in late 2018, when Dr. Chambers retired. (ECF No. 12-12, p. 48). In February 2019, Dr. Guyer noted she was doing well on her current medications with no new problems or complaints. *Id.* at 95.

Two months later, Plaintiff established care with psychiatrist, Dr. Keith Berner. (ECF No. 12-2, pp. 47-50). She reported weekly mood swings, paranoia, depression, and continued hallucinations, indicating she saw herself as a psychic. Plaintiff requested a higher dosage of Clonazepam or to switch to another Benzodiazepine. Dr. Berner was not comfortable with this and voiced some concern that Dr. Chambers' records did not document a clear diagnosis of attention deficit hyperactivity disorder ("ADHD"); however, because she described long-standing academic struggles and anxiety, he found this could be evidence of ADHD and continued the Adderall. Noting her history of instability and hallucinations that now appeared to be stable, Dr. Berner added Prazosin, recommended increased social interaction, and advised talk therapy.

In May 2019, her depression was worse, but the medications were helpful in controlling her psychosis. (ECF No. 12-2, pp. 44-46). Dr. Berner prescribed a taper off the Paroxetine and noted he would make only one medication change at a time.

On June 26, 2019, she phoned his office five times, requesting an early refill of her Adderall. (ECF No. 12-2, p. 42). Dr. Berner noted her prescription was not due for renewal until June 30, but he would allow her to refill it four days early. He advised her, however, that repeated phone calls were counterproductive and could result in her dismissal from the clinic.

During a follow-up in early July, Plaintiff reported recently separating from her husband. (ECF No. 12-2, pp. 39-41). Despite her prior reports that their relationship was good, and he was very supportive, she now divulged he was an alcoholic with a possible porn addiction. She indicated he had "taken everything that was worth anything," including the car, and he now wanted their mobile home. As a result, Plaintiff was struggling more with her mood and feeling alone and abandoned. Dr. Berner discontinued the Prazosin, as it was not helpful, but renewed her Adderall, Abilify, Clonazepam, and Duloxetine prescriptions and added Mirtazapine.

On July 22, 2019, she again phoned the doctor's office multiple times asking for an early refill of her Adderall. (ECF No. 12-2, p. 39). Dr. Berner explained that he was not comfortable with consistent early refills of this medication, and again warned her about repeated phone calls.

On August 12, 2019, allegedly without notice, Plaintiff's insurance status changed to Medicaid only. (ECF No. 12-2, p. 35). Because Dr. Berner was not a Medicaid provider, this required her to again obtain her prescriptions from Dr. Guyer. To notify him of this change in status, Plaintiff telephoned Dr. Berner's office 13 times in less than 20 minutes, from 2 different numbers, until he answered the phone. Hoping the issue would be solved quickly, she advised him that she would keep her September appointment with him. Dr. Berner phoned Dr. Guyer's nurse, who assured him that Dr. Guyer would fill her prescriptions in the interim. *Id.* at 35.

One week later, Plaintiff advised Dr. Berner by voicemail that she would be receiving all treatment from Dr. Guyer and would no longer need his services. (ECF No. 12-2, p. 34). Despite this, Dr. Berner received a fax from Walgreens on August 21, requesting assistance in handling Plaintiff's repeated requests for early Adderall refills. *Id.* at 33. They also advised him that she had only been picking up her Adderall and Clonazepam prescriptions, not the other medications he had prescribed. Given that she had cancelled his services, he advised Walgreens that she was no longer his patient.

On August 22, 2019, Plaintiff left five additional angry voicemail messages for Dr. Berner. (ECF No. 12-2, p. 33). She cursed at him for allegedly "red flagg[ing]" her. Two days later, Dr. Berner received another series of angry phone calls from Plaintiff, during which she cursed at him and accused him of ruining her life. *Id.* at 32. She also stated she discontinued all her medications, "cold turkey," and would be going back to "street drugs." As a result, Dr. Berner again reached out to Dr. Guyer's nurse to apprise them of the situation.

10

The ALJ dismissed Dr. Walz's opinion, finding her notations of Plaintiff's impaired attention and concentration and psychotic symptoms that would interfere with her ability to learn and retain skills to be vague. (ECF No. 12-2, p. 17). He also found no evidence to support a finding that the Plaintiff would have difficulty learning or retaining skills. The ALJ did not, however, recontact Dr. Walz to obtain clarification of her vague assessment. *See Johnson*, 627 F.3d at 320 (holding an ALJ should recontact a treating or consulting physician if a critical issue is undeveloped). Moreover, he failed to discuss Plaintiff's eleventh-grade education, her history of academic struggles, or Dr. Gene Chambers' 2014 assessment of moderately severe limitations in her ability to attend and sustain concentration, to sustain and complete work-like tasks, and to complete tasks within an acceptable time frame. He also failed to mention Dr. Donald Chambers' opinion that the Plaintiff could not work due to her mental impairments. (ECF No. 12-9, p. 76).

Instead, the ALJ relied heavily on treatment records indicating that Plaintiff's schizoaffective disorder, bipolar disorder, and anxiety responded well to the medications prescribed. But he failed to discuss Dr. Berner's 2019 records documenting her treatment noncompliance, repeated requests for early medication refills, and harassing behavior. These behaviors certainly suggest that Plaintiff's condition was not well controlled and would interfere with her ability to work with others.

We note that it is not uncommon for patients suffering from bipolar disorder and/or schizoaffective disorder to discontinue their medications at will. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 5 (DSM-5) 129 (5th ed. 2013); Charolette E. Grayson, *Bipolar Disorder: Taking Your Bipolar Medication*, at www.webmd.com. According to the DSM, patients suffering from schizoaffective disorder and bipolar disorder suffer from anosognosia, or poor insight. DSM-5 129 (4th ed. 2000). "Evidence suggests that poor

11

insight is a manifestation of the illness, rather than a coping strategy…. This symptom predisposes the individual to noncompliance with treatment and has been found to be predictive of higher relapse rates, increased number of involuntary hospital admissions, poorer psychosocial functioning, and a poorer course of illness." *Id*. These disorders are also frequently associated with substance abuse. Luke Archibald, et al., ALCOHOL USE DISORDER AND SCHIZOPHRENIA OR SCHIZOAFFECTIVE DISORDER NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM (2019), found at https://arcr.niaaa.nih.gov/alcohol-use-disorder-and-co-occurring-mental-health-conditions/alcohol-use-disorder-and-schizophrenia-schizoaffective-disorder (last visited January 24, 2022); Frederick K. Goodwin & Kay Redfield Jamison, MANIC-DEPRESSIVE ILLNESS 219-25 (2d ed. 1990); Li-Tzy Wu et al., "Influence of Comorbid Alcohol and Psychiatric Disorders on Utilization of Mental Health Services in the National Comorbidity Survey," 156 *Am. J. Psychiatry* 1235 (1999); Edward J. Khantzian, "The Self-Medication Hypothesis of Addictive Disorders: Focus on Heroin and Cocaine Dependence," 142 *Am. J. Psychiatry* 1259, 1263 (1985). Substance abuse serves as a means by which the sufferer tries to alleviate their symptoms. *Id*. The ALJ, however, failed to consider either of these factors, and for this reason, we find that remand is necessary.

On remand, the ALJ should be directed to order a second consultative mental evaluation with Dr. Patricia Walz, affording her the opportunity to reevaluate the Plaintiff, review Plaintiff's most recent treatment records, and clarify her opinion that Plaintiff's attention and concentration were impaired and that her psychosis would interfere with her ability to learn and retain skills. The ALJ should also ask Dr. Walz to weigh in on whether the Plaintiff's noncompliance, harassing behavior toward Dr. Berner, and potential Adderall abuse are related to her diagnoses of schizoaffective disorder and bipolar disorder. Should Dr. Walz be unavailable or otherwise unable

to conduct a second consultative exam, the ALJ should be ordered to obtain a consultative mental evaluation from another mental health professional to address these issues.

## IV. Conclusion

Based on the foregoing, I recommend reversing and remanding this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 25th day of January 2022.

/s/ *Mark E. Ford*
HON. MARK E. FORD
CHIEF UNITED STATES MAGISTRATE JUDGE